USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    6/23/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

NATHANIEL SLATER,                          :

                          Petitioner,      :          **REPORT AND**
                                                      **RECOMMENDATION**
                                                      **TO THE HONORABLE**
          -against-                        :          **JED S. RAKOFF**

UNITED STATES OF AMERICA,                  :          04cr48-JSR
                                                      13cv670-JSR-FM
                          Respondent.      :

-----------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

I.     Introduction

          Pro se petitioner Nathaniel Slater ("Slater") brings this proceeding pursuant

to 28 U.S.C. § 2255 ("Section 2255") to vacate his conviction on a single count of

conspiracy to distribute at least fifty grams of crack cocaine in violation of 21 U.S.C.

§§ 841, 846, following a jury trial before Your Honor.[1]  On June 28, 2007, Slater was

sentenced to a thirty year term of imprisonment.  (S. 24-25).[2]  Thereafter, Your Honor

reduced that sentence to a twenty-eight year term of imprisonment.  (R. 19).

---

[1]       Slater was tried with three co-defendants, Anthony Bowens, Jeffrey Martinez, and
Nelson Martinez.  Slater's co-defendants also were convicted of the same conspiracy charge.  In
addition, Bowens was convicted on a substantive crack cocaine distribution count.

[2]        "Cr. ECF No." refers to docket entries in 04cr48.  "Civ. ECF No." refers to
docket entries in 13cv670, the related civil proceeding.  "Ex." refers to the exhibits annexed to
Slater's reply papers.  (See Civ. ECF No. 21 ("Reply")).  "S." refers to the transcript of Slater's
original sentencing.  (Ex. A).  "R." refers to the transcript of Slater's resentencing.  (Ex. B).
"Tr." refers to the trial transcript.  (Cr. ECF Nos. 1146-50).

In his papers, (see ECF No. 2 ("Pet'r's Mem."); Reply), Slater alleges that he was denied the effective assistance of counsel in violation of the Sixth Amendment. In particular, Slater argues that William H. Devaney, Esq. ("Mr. Devaney"), his trial and appellate counsel, was ineffective because he failed to (a) object to factfinding during the sentencing and resentencing proceedings that violated the principles announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), (b) object to the making of new findings of fact during resentencing, (c) argue on appeal that Slater was entitled to resentencing pursuant to the Fair Sentencing Act, Pub. L. No. 111-220 (2010) ("FSA" or the "Act"), (d) raise a statute of limitations defense at trial, and (e) argue on appeal that the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. (See Pet'r's Mem. at 6-24; Reply at 5-7).

For the reasons set forth below, Slater's petition should be denied.

II.    Background

    A.    Trial[3]

        1.    Government's Case

The Government's proof at trial would have enabled a reasonable juror to conclude as follows:

Slater was one of the leaders of a crack-cocaine distribution enterprise that operated out of the Mitchel Houses, a public housing project in the Bronx, from 1994 to

---

[3]    Because this case was tried before Your Honor, I have not recited the evidence at length, nor have I cited specific pages of the trial transcript in this section of my Report and Recommendation.

2004.  The Mitchel Houses are comprised of a number of residential apartment buildings, including buildings at 175 Alexander Avenue ("Building 175"), 215 Alexander Avenue ("Building 215"), 350 East 137th Street ("Building 350"), and 360 East 137th Street ("Building 360").  Slater was the boss of Buildings 350 and 360.  He was assisted in this enterprise by numerous individuals, including George Verdejo ("Verdejo"), James House ("House"), and Norbell Lynch ("Lynch").  Eric Glover ("Glover") was the boss of Building 215 from approximately 2002 to 2005.  Verdejo, House, Lynch, and Glover each pled guilty to participation in the conspiracy and testified as Government witnesses at trial.

Verdejo, House, and Lynch each sold crack cocaine for Slater in Buildings 350 and 360 in various capacities between 1994 and 2000.  More specifically, Verdejo worked for Slater on and off from approximately 1994 to 1999.  During that period, he served as a "lookout" responsible for warning others of a police presence, a "pitcher" selling crack cocaine directly to customers, and as Slater's manager.  House worked for Slater as a pitcher from about 1996 to 2000, and Lynch worked as a lookout and pitcher from approximately 1997 to 1999.  At the height of the conspiracy, Slater's workers sold between 100 and 200 grams of crack cocaine per day in Buildings 350 and 360.

Around 1999, Verdejo stopped working for Slater, and Clinton McCollum, a/k/a "Smoothie" ("McCollum"), took over as Slater's manager.  Slater continued to run Buildings 350 and 360 until January 2003, when McCollum was arrested.  Following McCollum's arrest, Slater ceased operations at Buildings 350 and 360, but told the bosses

3

of other buildings that he would reopen Building 350 after McCollum's sentencing.

Around August 2004, Slater did, in fact, try to restart operations at Building 350. As part

of that effort, he provided House with $500 worth of crack cocaine to sell at Building

350, but House had difficulty attracting customers. In or around September 2004, after

Slater's efforts to reopen Building 350 failed, he partnered with another leader of the

conspiracy, Trey Boglin ("Boglin"), selling crack cocaine out of Boglin's building,

Building 175.

> 2.   Defense Case

Slater did not present a defense.

B.   Verdict and Sentencing

After more than two weeks of trial and two full days of deliberations, the

jury convicted Slater and each of his co-defendants on the count of the indictment

charging that they conspired to distribute at least fifty grams of crack cocaine. (Tr. 2001-

02). Thereafter, on June 28, 2007, Your Honor sentenced Slater to a term of thirty years

in prison, to be followed by five years of supervised release. (S. 24). In arriving at this

sentence, Your Honor determined that Slater's Sentencing Guidelines ("Guidelines") base

offense level ("BOL") was thirty-eight because of the amount of crack cocaine involved

in the conspiracy. Specifically, Your Honor found that the conspiracy involved "vastly in

excess" of one and one-half kilograms of crack cocaine, which, at that time, was the

amount necessary to trigger the maximum BOL. (See id. at 5); Guidelines § 2D1.1

(2006). Your Honor also determined that Slater's leadership role in the conspiracy

4

warranted the imposition of a four-level Guidelines offense level enhancement.  (See S.

4); Guidelines § 3B1.1(a) (2006).

      C.      Intervening Changes in Law

      Following sentencing, the law changed in two ways that had the potential to

impact Slater's sentence.  First, on December 10, 2007, the Supreme Court decided

Kimbrough v. United States, 552 U.S. 85 (2007).  In Kimbrough, "the Supreme Court

held that a [judge's] policy disagreement with the cocaine powder/crack cocaine disparity

in the Guidelines can be grounds for a non-Guidelines sentence."  United States v.

Moody, 381 F. App'x 113, 115 (2d Cir. 2010) (citing Kimbrough, 552 U.S. at 109-10).

At that time, the Guidelines "treated every gram of crack cocaine as the equivalent of 100

grams of powder cocaine" for sentencing purposes – a discrepancy that the United States

Sentencing Commission (the "Commission") had concluded was "generally

unwarranted."  See Kimbrough, 552 U.S. at 96-97.  Second, in 2007, the Commission

amended the Guidelines to reduce the powder cocaine/crack cocaine disparity.  The

amendments ("2007 Amendments") increased the quantity of crack cocaine triggering the

maximum BOL from one and one-half to four and one-half kilograms.  (The powder

cocaine drug quantity leading to the maximum BOL remained the same:  one hundred and

fifty kilograms.)  See 72 Fed. Reg. 28571-72 (9).

D.      Subsequent Procedural History

1.      First Appeal

On appeal, Slater advanced several arguments, among them that he was "entitled to resentencing in light of Kimbrough . . . and the [2007 Amendments]." United States v. Moore, 322 F. App'x 78, 84 (2d Cir. 2009). On April 17, 2009, the Second Circuit affirmed Slater's conviction, but remanded the case for resentencing based on the intervening changes to the law. See id.

2.      Resentencing

Following the remand, Slater was resentenced on October 16, 2009. (R. 1). During the resentencing, Your Honor concluded that Slater's sentence was not impacted by the 2007 Amendments because the amount of crack cocaine involved in the conspiracy was "vastly in excess" of the four and one-half kilograms quantity that would trigger the maximum BOL under the 2007 Amendments. (Id. at 4). Turning to Kimbrough, Your Honor declined to impose a non-Guidelines sentence, noting that, even assuming a "one-to-one ratio between powder cocaine and crack cocaine," the amount of crack cocaine involved in the conspiracy was "easily" over the one hundred and fifty kilogram quantity triggering the maximum BOL for powder cocaine. (Id. at 9). Nevertheless, Your Honor reduced Slater's sentence to twenty-eight years based on "evidence that . . . Slater was moving in the right direction." (Id. at 15, 19).

3.    Subsequent Appeals

Slater appealed his amended sentence arguing, insofar as relevant, that the Court had "overestimated the amount of crack cocaine for which [he was] . . . responsible because it credited [him] with drugs sold or distributed by [his] co-conspirators." United States v. Mitchell, 421 F. App'x 102, 104 (2d Cir. 2011).[4]  On May 5, 2011, the Second Circuit again affirmed Slater's conviction, "agree[ing] with [Your Honor] that the evidence was sufficient to find that the conspiracy involved at least 150 kilograms of crack cocaine and that this quantity of crack cocaine was reasonably foreseeable to . . . Slater." Id. at 104-05.  Nevertheless, the Court of Appeals remanded the case because of two "ministerial errors" – namely, the failure to (a) enter an amended judgment (rather than merely granting Slater's motion) and (b) memorialize in writing the reasons for the non-Guidelines sentence. Id. at 106.  Although Your Honor corrected these ministerial errors in December 2012, Slater again appealed.  (See Cr. ECF No. 1070).  On August 22, 2014, however, the Second Circuit dismissed Slater's third appeal without reaching the merits.  (Id.).

E.    Habeas Petition

On January 28, 2013, Slater filed the present petition.  (See Civ. ECF No. 1 ("Petition") at 1).  On April 12, 2013, I stayed further proceedings pending the outcome of Slater's third appeal.  (Civ. ECF No. 14).  Following the lifting of the stay, the Government timely filed its opposition papers on November 11, 2015.  (Civ. ECF Nos.

---

[4]      At this stage, Slater proceeded pro se.  See id. at 103.

15, 16 ("Resp't's Mem.")).  Thereafter, on February 1, 2016, Slater filed his Reply.

(Reply).  The Petition consequently is fully submitted.

III.    Standard of Review

　　　　The statute controlling Slater's right to collateral relief is Section 2255, the

first sentence of which provides:

> A prisoner in custody under sentence of a court established by
> Act of Congress claiming the right to be released upon the
> ground that the sentence was imposed in violation of the
> Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the
> sentence was in excess of the maximum authorized by law, or
> is otherwise subject to collateral attack, may move the court
> which imposed the sentence to vacate, set aside or correct the
> sentence.

Section 2255(a).  Relief under this statute may be based only on "constitutional error, or

an error of law or fact constituting a 'fundamental defect which inherently results in a

complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)

(quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  Among the reasons for

circumscribing habeas relief in this fashion are "a respect for the finality of criminal

sentences, the efficient allocation of judicial resources, and an aversion to retrying issues

years after the underlying events took place."  Id.

IV.    Ineffective Assistance of Counsel

　　　　To prevail on an ineffective assistance of counsel claim, a petitioner must

demonstrate that (A) his counsel's performance "fell below an objective standard of

reasonableness" and (B) there is a "reasonable probability that, but for counsel's

8

unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  With respect to the first of these requirements, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." Id. at 689.  This deference is due because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 702 (2002).  Therefore, a petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted).

Although the Strickland test has two prongs, a court considering an ineffective assistance claim need not "address both components of the [Strickland] inquiry if the [petitioner] makes an insufficient showing on one." Strickland, 466 U.S. at 697.  Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Id.

A.    Failure to Object to an Apprendi Violation

Slater first contends that his attorney was ineffective for failing to object to factfinding during the sentencing and resentencing proceedings, arguing that any factfinding that increased his sentence "must be treated as elements of the offense rather than mere sentencing factors." (Pet'r's Mem. at 6-11; Reply at 9).  In essence, Slater

argues, based on <u>Apprendi</u>, that his sentencing and resentencing were unconstitutional, and that his counsel was ineffective for failing to raise this issue.[5]

In <u>Apprendi</u>, the Supreme Court held that "any fact that increases the penalty for a crime beyond the <u>prescribed statutory maximum</u> must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490 (emphasis added). <u>Apprendi</u> has also been applied to facts that increase the statutory minimum penalty.  <u>See</u> <u>Alleyne v. United States</u>, 133 S. Ct. 2151, 2163 (2013).  Accordingly, any facts that increase either the statutory maximum or minimum must now be submitted to a jury.  <u>Id.</u> at 2161 n.2.  However, "this is distinct from factfinding used to guide judicial discretion in selecting a punishment 'within limits fixed by law.'"  <u>Id.</u> (quoting <u>Williams v. New York</u>, 337 U.S. 241, 246 (1949)).  Although "such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing."  <u>Id.</u> Consequently, "when a judge sentences a defendant within the statutory range authorized

---

[5]        Alternatively, Slater claims that, even if factfinding were warranted, Your Honor should have held a <u>Fatico</u> hearing to determine the quantity of crack cocaine involved in the conspiracy.  (Pet'r's Mem. at 10).  Your Honor considered holding a <u>Fatico</u> hearing, but ultimately deemed it was unnecessary because the Court could "easily" make the necessary findings based on the "credible" trial "testimony of the cooperators."  (R. 5-9).  The Second Circuit has held that a "district court is not required . . . to hold a full-blown evidentiary hearing in resolving sentencing disputes."  <u>See</u> <u>United States v. Phillips</u>, 431 F.3d 86, 93 (2d Cir. 2005) (quoting <u>United States v. Slevin</u>, 106 F.3d 1086, 1091 (2d Cir. 1996)).  It therefore was sufficient that Slater was given opportunity to contest the Government's allegations though written submissions and oral testimony.  (<u>See</u> R. 2, 15-17); <u>United States v. Mena</u>, 342 F. App'x 656, 658 (2d Cir. 2009) ("Because [the defendant] was afforded an opportunity to rebut the government's allegations, including a specific invitation for [the defendant] to present testimony on the issue, the district court appropriately applied the enhancement without conducting a <u>Fatico</u> hearing.").

by the jury verdict and uses advisory Guidelines to calculate that sentence, there is no

[constitutional] violation." United States v. Vaughn, 430 F.3d 518, 528 (2d Cir. 2005)

(Sotomayor, J.).

        Slater was sentenced to thirty years in prison, and resentenced to twenty-

eight years in prison, based on his conviction on a charge of conspiracy to distribute at

least fifty grams of crack cocaine in violation of Title 21, United States Code, Section

841.  That crime carries a statutory minimum penalty of ten years and a statutory

maximum penalty of life in prison.  21 U.S.C. §§ 841(b) (2002).  At the sentencing and

resentencing, consistent with the Guidelines, Your Honor made findings with respect to

Slater's leadership role and the quantity of crack cocaine involved in the conspiracy.

(S. 4-5; R. 9).  These findings increased Slater's Guidelines sentencing range.  Because

neither of the Guidelines factors considered by Your Honor raised the statutory minimum

or maximum penalties applicable to the crime, however, there was no Apprendi violation.

See Castillo v. United States, No. 01 Civ. 7167 (HB), 2002 WL 31365941, at *2

(S.D.N.Y. Oct. 18, 2002) (finding no Apprendi violation even though the sentencing court

determined the amount of drugs involved in the offense because the "[p]etitioner's

sentence . . . did not exceed the statutory maximum").  It follows that Mr. Devaney

cannot be faulted for failing to raise a meritless claim.  See Gomez v. Duncan, No. 02

Civ. 846 (LAP) (AJP), 2004 WL 119360, at *34 (S.D.N.Y. Jan. 27, 2004).

B.      Failure to Object to Judicial Fact-Finding at Resentencing

Continuing in much the same vein, Slater contends that Mr. Devaney was ineffective because he failed to object to Your Honor making new factual findings during the resentencing rather than relying on the findings made at the original sentencing. (Pet'r's Mem. at 12-16).  In particular, Slater takes issue with Your Honor's recalculation of the quantity of crack cocaine involved in the conspiracy.[6]  (Id.).

Contrary to Slater's contention, it clearly was not error to perform this recalculation.  "Indeed, new findings are often necessary where . . . retroactive amendments have altered the relevant drug-quantity thresholds for determining a [petitioner's BOL]."  United States v. Rios, 765 F.3d 133, 138 (2d Cir. 2014), cert. denied sub nom., Bautista v. United States, 136 S. Ct. 56 (2015) (quoting United States v. Woods, 581 F.3d 531, 539 (7th Cir. 2009)).  Accordingly, in such circumstances, a court may make "new findings of fact . . . so long as those findings are not inconsistent with those made at the original sentencing."  Id. (quoting United States v. Davis, 682 F.3d 596, 612 (7th Cir. 2012)).

_____

[6]      Slater also argues that his counsel should have objected to Your Honor's consideration of the 2007 Amendments during resentencing because this was not authorized by the remand order and violated the Ex Post Facto Clause of the Constitution.  (Pet'r's Mem. at 13; Reply at 9).  Both of these arguments are baseless for a number of reasons.  Most significantly, consideration of the 2007 Amendments could only have resulted in a lower sentence for Slater because the Amendments increased the crack cocaine drug-quantity threshold for determining a defendants BOL.  Slater therefore clearly suffered no prejudice as a result of Mr. Devaney's supposed failure.  See Strickland, 466 U.S. at 697; see also Dorsey v. United States, 132 S. Ct. 2321, 2332 (2012) ("The Constitution's Ex Post Facto Clause . . . does not prohibit applying lower penalties" "to pre-Act conduct").

The 2007 Amendments and <u>Kimbrough</u> made it necessary for the Court to make new findings of fact with regard to the quantity of crack cocaine involved in the conspiracy before Slater was resentenced.  The 2007 Amendments, for example, materially "altered the relevant drug-quantity thresholds for determining a [petitioner's BOL]."  <u>Id.</u>  As a consequence, so long as the new findings did not contradict the original sentencing findings, there was no error.  <u>Id.</u>  As noted above, during the original sentencing, consistent with the Guidelines then prevailing, Your Honor found that the quantity of cocaine involved in the conspiracy "was <u>vastly</u> in excess" of one and one-half kilograms.  (S. 5) (emphasis added).  During resentencing, Your Honor found that the amount of crack cocaine involved in the conspiracy was, in fact, in excess of one hundred and fifty kilograms.  (R. 9).  There simply is nothing inconsistent about these two findings.  Indeed, both findings relied on the same information, namely, "credible" trial testimony that "Slater's share of the operation" involved the purchase of "100 to 200 grams of crack [cocaine] on almost a daily basis."  (S. 5; R. 7, 9).

In sum, since the Court's finding during the resentencing regarding the weight of the drugs was consistent with its earlier factual determination, Mr. Devaney did not err in failing to raise a futile objection.

C.   <u>Failure to Argue Intervening Change in Law on Appeal</u>

In his Reply, Slater argues for the first time that Mr. Devaney was ineffective for failing to argue on appeal that he was entitled to resentencing based on the passage of the FSA.  (Reply at 5-7).  It appears, however, that he was represented by

counsel only in connection with his first appeal.  See Moore, 322 F. App'x at 78;

Mitchell, 421 F. App'x at 102; Cr. ECF No. 980 (pro se notice of third appeal).  That

appeal was decided, however, in 2009, before the FSA was enacted.  See FSA.  While

appellate counsel may be held to a high standard, clairvoyance is not a required trait.

Even if the Court were to overlook that impediment to his claim, Slater's underlying

substantive claim would be meritless.

      The FSA, which went into effect on August 3, 2010, "increased the drug

amounts triggering mandatory minimums for crack trafficking offenses . . . from 50

grams to 280 grams."  See Dorsey, 132 S. Ct. at 2329 (citing FSA § 2(a)).  As required by

the Act, on November 1, 2010, the Commission promulgated emergency amendments

("2010 Amendments") to bring the Guidelines into conformity with the FSA.  See id.

(citing 75 Fed. Reg. 66188 (2010)).  Similar to the 2007 Amendments, the 2010

Amendments increased the crack cocaine drug quantity threshold for determining an

individual's BOL.  In Dorsey, the Supreme Court held that the FSA and 2010

Amendments applied to individuals who were convicted before the FSA went into effect

but sentenced afterward.  Id. at 2335.  However, "[t]he FSA does not apply retroactively

to defendants . . . who were convicted and sentenced prior to August 3, 2010."  United

States v. Rowley, 543 F. App'x 104, 105 (2d Cir. 2013).

      Your Honor resentenced Slater on October 16, 2009.  Accordingly, the FSA

and 2010 Amendments do not apply to his case.  Slater seeks to overcome this by arguing

that he still had appeals that were pending.  (Reply at 7).  Assuming that this is correct, it

14

is entirely irrelevant since it is undisputed that he was convicted and sentenced before the

FSA took effect.  See Rowley, 543 F. App'x at 105.

In sum, the FSA does not apply to this case, and Slater's appellate counsel

cannot be faulted for failing to argue that it did.

D.    Failure to Raise a Statute of Limitations Defense

Slater next contends that Mr. Devaney was deficient for failing to raise a

statute of limitations defense at trial.  According to Slater, his trial counsel should have

argued that he withdrew from the conspiracy before the statute of limitations period.

(Pet'r's Mem. at 21-24).

It is settled law that, "[u]pon joining a criminal conspiracy, a defendant's

membership in the ongoing unlawful scheme continues until he withdraws."  Smith v.

United States, 133 S. Ct. 714, 717 (2013).  Ordinarily, "[w]ithdrawal terminates the

defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty

of conspiracy."  Id. at 719.  As Slater correctly observes, however, (Pet'r's Mem. at 21-

24), "[w]ithdrawal also starts the clock running on the time within which the defendant

may be prosecuted, and provides a complete defense when the withdrawal occurs beyond

the applicable statute-of-limitations period."  Smith, 133 S. Ct. at 719-20.  Because

withdrawal is an affirmative defense, the defendant bears the burden of proving its

applicability at trial.  See United States v. Soto, 269 F. App'x 22, 25 (2d Cir. 2008).

To effectuate a withdrawal, a defendant must show that "he performed

some act that affirmatively established that he disavowed his criminal association with the

15

conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." United States v. Leslie, 658 F.3d 140, 143 (2d Cir. 2011) (quoting United States v. Eppolito, 543 F.3d 25, 49 (2d Cir. 2008)).  Moreover, "the defendant must not take any subsequent acts to promote the conspiracy" or "receive any additional benefits from the conspiracy." United States v. Berger, 224 F.3d 107, 118 (2d Cir. 2000).  It follows that "[m]ere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal." Leslie, 658 F.3d at 143.

The narcotics conspiracy charge against Slater was subject to a five year statute of limitations.  18 U.S.C. § 3282(a).  Therefore, in order to have mounted a "complete defense," Slater would have had the burden at trial of establishing that he withdrew from the conspiracy on or before February 22, 2000, five years prior to the filing of the original indictment.  (See Cr. ECF No. 16 ("Original Indictment") at 1).[7]  At trial, however, there was substantial evidence that Slater continued to participate in the conspiracy after 2000.  Indeed, Glover testified that Slater was the boss of Building 350

---

[7]     On January 23, 2007, the Government filed a superseding indictment.  (See Cr. ECF No. 379 ("Superceding Indictment")).  "[A] superseding indictment that supplants a pending timely indictment relates back to the original pleading and inherits its timeliness as long as the later indictment does not materially broaden or substantially amend the original charges." See United States v. Salmonese, 352 F.3d 608, 622 (2d Cir. 2003).  Hence, the relevant date for statute of limitations purposes is five years prior to the filing of the Original Indictment because that charging instrument is similar in all material respects to the Superceding Indictment. (Compare Original Indictment ¶¶ 2, 7 (charging Slater with conspiracy to distribute at least fifty grams of cocaine and noting that Slater served as a "boss[]"), with Superceding Indictment ¶¶ 2, 7 (same)).

in 2002, (Tr. 289-91, 371-72), and Glover, House, and Verdejo testified that it was not until McCullom was arrested, in 2003, that Slater stopped selling crack cocaine in Building 350, (id. at 372-74, 1149-50, 1559-60). Glover also testified that Slater told him and other bosses that "he was going to return and open up [Building] 350" after McCullom "[was] sentenced." (Id. at 373). Consistent with that statement, House testified that in approximately August 2004, Slater provided him $500 worth of crack cocaine to sell at Building 350 in an effort to "open" the building. (Id. at 1149-51). Both House and Glover also testified that when that effort failed, (id. at 1150-51), Slater began selling crack cocaine out of Building 175, (id. at 375-76, 1154-55). Accordingly, Slater cannot show that he ceased his participation in the conspiracy before February 22, 2000, let alone establish that he "affirmatively . . . disavowed his criminal association with the conspiracy." Leslie, 658 F.3d at 143. Furthermore, in light of this evidence, Mr. Devaney cannot be faulted for failing to raise the meritless argument that Slater had renounced his role in the conspiracy by early 2000.

     E.    Failure to Raise a Brady Violation on Appeal

     Finally, Slater contends that Mr. Devaney was ineffective for failing to argue that the prosecution violated Brady, and its progeny, by withholding evidence that could have been used to exculpate him or impeach the cooperating witnesses.

     Brady requires the prosecution to disclose any "evidence favorable to the accused" that is "material either to guilt or to punishment." 373 U.S. at 87. To establish a Brady violation, a petitioner must show that: (1) the evidence in question is "favorable

to the accused, either because it is exculpatory or because it is impeaching"; (2) the evidence was "suppressed, either willfully or inadvertently," by the prosecution; and (3) the omission prejudiced the petitioner.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Prejudice results when the undisclosed evidence is "material," which, in turn, requires that there be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  Stated somewhat differently, there must be a showing that the withheld "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

Slater asserts that the prosecution improperly failed to turn over to his counsel two Federal Bureau of Investigation "302" forms concerning interviews with Crystal Shaver ("Crystal"), a drug dealer in the Mitchel Houses.  (Pet'r's Mem. at 16-20).  During the interviews, Crystal told the FBI that she lived in Building 350.  (See Resp't's Mem., Ex. A (FBI 302, dated March 7, 2005 ("Interview I")), at 1; id., Ex. B (FBI  302, dated June 17, 2005 ("Interview II")), at 1).  According to Crystal, around 2002, she began selling crack cocaine out of Building 215 for Glover, whom she referred to as "Gucci."  (Interview I at 1; Interview II at 1; Tr. 61).  Crystal maintained that during that time Glover was the boss of that building.  (Interview II at 1).[8]  Crystal also noted,

---

[8]      Crystal made a number of inconsistent statements regarding the time period that she was selling drugs for Glover.  During Interview I, Crystal maintained that she only sold drugs for Glover from March 2003 to April 2004.  (Interview I at 2).  During Interview II,

however, that she once delivered drugs to an apartment in Building 350, and that Glover was the boss of Building 350.  (Interview I at 2).  Slater contends that these statements by Crystal establish that he was not the boss of Building 350, and, thus, not a participant in the conspiracy.  Alternatively, Slater argues that these statements establish that he had withdrawn from the conspiracy before February 2000, bolstering his statute of limitations defense.  According to Slater, the interview notes were not turned over to him until two years after the trial.  (Pet'r's Mem. at 19).

Even if one were to assume that Crystal actually believed that Glover was the boss of Building 350,[9] and that the prosecution either "inadvertently or willfully" withheld interview notes establishing that fact, Slater clearly was not prejudiced as a result.  As an initial matter, Slater's first contention – that the statements show that he was never a participant in the conspiracy – is baseless.  There was overwhelming evidence at

Crystal said that she sold drugs for Glover from approximately June 2000 to April 2004.  (Interview II at 1).  Glover was in jail from 1994 to 2002, however.  (Tr. 61, 253).

[9]     There is reason to believe that this statement in the 302 was either an error on the part of Crystal or incorrectly transcribed.  Crystal apparently said, immediately after noting that Glover was the boss of Building 350, that two other drug dealers, "Benetton and Tyreek[,] . . . work[ed] out of Building 350."  (Interview I at 2).  But earlier in the same interview, she said that Benetton and Tyreek "sell in front of and inside Building 215" and that "[Glover] was the person in charge of drug sales at Building 215."  (Id. at 1) (emphasis added).  Similarly, during Interview II, Crystal said that "drug sales in [Building] 215 were controlled by [Glover]," "Tyreek was [the] manager for [Glover]," and that she "pitch[ed] drugs inside of Building 215" for Glover.  (Interview II at 1).  (Crystal also said that Benetton sold drugs at two unrelated buildings in the Mitchel Houses during Interview II.)  (Id. at 3).  Moreover, Glover testified at trial that he was the boss at Building 215, (Tr. 322), and that Benetton and Tyreek worked for him in Building 215, (Tr. 226, 270, 294).  Accordingly, it seems plausible that Crystal either mistakenly said that Glover, Benetton, and Tyreek worked out of Building 350, rather than Building 215, or that her actual statement was mistranscribed.

trial that Slater participated in the conspiracy prior to 2000.  Indeed, Glover, Lynch, House, and Verdejo all testified that Slater was the boss of Building 350, and the latter three testified that Slater employed them to sell crack cocaine in Building 350.  (Tr. 291, 656-57, 710-711, 993-94, 1436, 1522-25).

Accordingly, Crystal's statements could only be exculpatory to the extent they support Slater's contention that he withdrew from the conspiracy.  In that regard, it is undisputed that Glover was in jail from 1994 to 2002.  (Id. at 61, 253).  At best, Crystal's statements therefore might help establish that Glover, rather than Slater, was the boss of Building 350 at some point between 2002 and 2004.  Even if that were true, it would not cast doubt on the ample evidence that Slater participated in the conspiracy well into 2004.  Indeed, as the Government observes, (Resp't's Mem. at 13-14), Glover may have taken over control of Building 350 when Slater left following McCullom's arrest.  Nonetheless, Crystal's statements do not contradict the credible testimony that Slater was the boss of Building 350 prior to 2002, (Tr. 289-91, 371-72), tried to reopen Building 350 in 2004, (id. at 373, 1149-51), and partnered with Boglin to sell crack cocaine in Building 175 in 2004, (id. at 375-76, 1154-55).  Moreover, Crystal's testimony does not suggest that Slater performed any act that "affirmatively . . . disavowed his criminal association with the conspiracy."  Leslie, 658 F.3d at 143.

As a consequence, Slater cannot show a reasonable probability that the outcome of his case would have been different had the Government turned over the notes of Interviews I and II.  Strickler, 527 U.S. at 281-82.  Nor do the FBI 302s undermine

confidence in the verdict.  <u>Kyles</u>, 514 U.S. at 435.  Accordingly, even if the 302s

constituted a <u>Brady</u> violation, Slater was not prejudiced by their delayed production, nor

was Mr. Devaney ineffective for failing to raise this claim.

V.      <u>Conclusion</u>

        For the reasons set forth above, Slater's Petition should be denied.

VI.     <u>Notice of Procedure for Filing Objections to this Report and Recommendation</u>

        The parties shall have fourteen (14) days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  <u>See also</u> Fed. R. Civ. P. 6(a) and (e).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Jed S. Rakoff at the United States Courthouse, 500

Pearl Street, New York, New York 10007, to my chambers at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.

<u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Rakoff.  The failure to

file these timely objections will result in a waiver of those objections for purposes of

appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(e), 72(b).

                  SO ORDERED.

Dated:        New York, New York
               June 23, 2016

                                                   FRANK MAAS
                       United States Magistrate Judge

Copies to:

Nathaniel Slater (via U.S. mail)
Reg. No. 59242-054
FCI Loretto
Federal Correctional Institute
P.O. Box 1000
Loretto, Pennsylvania 15940

Andrew Ken-Wei Chan (via ECF)
Assistant United States Attorney